Eddie Mitchell TASBY et al.

v.

Dr. Nolan ESTES, General Superintendent, Dallas Independent School District, et al.

**and**

Donald E. Curry et al., Intervenors.

No. CA 3–4211–C.

United States District Court,
N. D. Texas,
Dallas Division.

March 10, 1976.

Supplemental Opinion and Order
April 7, 1976.

See also D.C., 412 F.Supp. 1185.

Edward B. Cloutman, III, Mullinax, Wells, Mauzy & Baab, Inc., Sylvia Demarest, Director Dallas Legal Services Foundation, Inc., Dallas, Tex., Melvyn Leventhal, New York City, Vilma S. Martinez, Mexican American Legal Defense and Educational Fund, Inc., San Francisco, Cal., and Albert H. Kauffman, San Antonio, Tex., for plaintiffs.

Warren Whitham, Spafford, Gay & Whitham, and Mark Martin, Strasburger, Price, Kelton, Martin & Unis, Dallas, Tex., for defendants.

Robert H. Mow, Jr., and Robert L. Blumenthal, Carrington, Coleman, Sloman, Johnson & Blumenthal, Dallas, Tex., for Donald E. Curry et al.

James G. Vetter, Jr., Elliott, Meer, Vetter, Denton, Bates & Cole, Dallas, Tex., for Oak Cliff Citizens.

N. Alex Bickley, City Atty., Dallas, Tex., for City of Dallas.

James T. Maxwell, pro se.

Martin Frost, Barber & Frost, and John W. Bryant, Dallas, Tex., for Dr. E. Thomas Strom, et al.

E. Brice Cunningham, L. A. Bedford, Jr., and Fred Finch, Jr., Dallas, Tex., for Metropolitan Branches of NAACP.

James A. Donohoe & G. Duffield Smith, Jr., Gardere, Porter & DeHay, Dallas, Tex., for Brinegar et al.

## OPINION AND ORDER

WILLIAM M. TAYLOR, Jr., Chief Judge.

The task presented to this Court is to adopt and implement a desegregation plan for the Dallas Independent School District (DISD) which will finally conclude the tortured history of this litigation and which will establish a unitary, nonracial system of public education in the DISD, as required by *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). This cause is here on remand from the Fifth Circuit Court of Appeals' decision of July 23, 1975,[1] which affirmed in part and reversed in part this Court's 1971 desegregation order. The Fifth Circuit has instructed this Court to formulate a student assignment plan which will remedy the dual nature of the DISD found to exist in 1971.

### I. *The Parties*

The cast of legal characters in this desegregation drama has changed since 1971, with the addition of new intervenors and

---

1. *Tasby v. Estes,* 517 F.2d 92 (5th Cir. 1975).

the departure of intervenors previously in the case. The present actors still include the plaintiffs, representing a class of black and Mexican-American students in the DISD; the defendant DISD; the Curry intervenors, representing a group of North Dallas students; the intervenor James T. Maxwell, representing himself; and the City of Dallas.[2] Additionally, the Metropolitan Branches of the National Association for the Advancement of Colored People (NAACP) were granted leave to intervene on August 25, 1975; the Strom intervenors, representing a class of persons living in naturally integrated areas of Western Oak Cliff and Pleasant Grove, were granted leave to intervene on August 25, 1975; and the Brinegar intervenors, representing a class of persons living in the naturally integrated area of East Dallas, were given leave to intervene on September 17, 1975.

On September 16 the Court challenged the business leaders of Dallas to become involved and further pointed out that everyone in the district had a job to do—that it was not a job for the Court alone. The business leaders have responded to the challenge and have shown their sincere interest. Many churches, their leaders, and many organizations have expressed significant interest and offered to assist the Court. Additionally, a group of citizens formed a committee composed of six blacks, seven Mexican-Americans, one American Indian and seven Anglos. This group became an affiliate of the Dallas Alliance and became known as the Educational Task Force of the Dallas Alliance. The Dallas Alliance is a community service organization designed to act on and aid in the solution of urgent issues of the community. It consists of a forty member Board of Trustees, and seventy-seven correspondent organizations in the Dallas area.

This Task Force met for a period of four months and spent approximately 1500 hours together in devising concepts and principles for a desegregation plan for a DISD. They sent various members of their group to cities around the country to discover all possible tools for desegregation, and met with or talked with thirty leading figures in the desegregation field. Finally, on February 17, 1976, the Alliance group filed their plan for the DISD with the Court. The Court granted them the status of Amicus Curiae for the purpose of presenting their ideas and plan to the Court, and heard evidence from Dr. Paul Geisel regarding the plan.

The Court has before it several student assignment plans, offered to remedy the dual nature of the DISD. The School Board, being charged with the responsibility of devising an acceptable plan,[3] filed its plan on the 10th of September, 1975. The NAACP devised a student assignment plan which was also filed on September 10. The Court was not wholly satisfied with either of these plans, as it indicated in a hearing on September 16. Therefore, the Court employed an expert in the field of education and desegregation, Dr. Josiah C. Hall of Miami, Florida. Dr. Hall presented a student assignment plan to the Court which was filed December 29, 1975. The plaintiffs meanwhile were working on a student assignment plan, and ended up filing two plans on January 12, 1976. Likewise, the Education Task Force of the Dallas Alliance met for several months considering concepts for a desegregation plan for the DISD, and filed their results with the Court on February 17, 1976. In addition, the Court received and has considered other plans and suggestions from various citizens and groups.[4]

2. The City of Dallas remained a party to this phase of the proceedings but did not play an active role during this phase.

3. Brown v. Board of Education (II), 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955).

4. A group of students at Skyline High School drew a student assignment plan for the DISD and submitted it to the Court. Others were submitted by the Alliance for Integrated Education and a number of other groups and concerned parents.

## II. *Applicable Law*

■ In this complex and ever-changing area of the law, it is difficult if not impossible to discover hard and fast rules for this Court to follow. Certainly, the "transition to a unitary, nonracial system of public education was and is the ultimate end to be brought about." *Green v. County School Board,* 391 U.S. 430, 436, 88 S.Ct. 1689, 1693, 20 L.Ed.2d 716, 722 (1967); *Alexander v. Holmes County Board of Education,* 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969); *Brown v. Board of Education II,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). Similarly, this Court recognizes that "[t]he objective today remains to eliminate from the public schools all vestiges of state-imposed segregation." *Swann v. Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554, 566 (1970).

Nevertheless, school districts are like fingerprints—each one is unique. Although the goal of a unitary, nonracial system is a constant, the method or plan for achieving that goal must be tailored to fit the particular school district involved. A plan that is successful in a district having a small student population or occupying a small area geographically, a rural district, a county-wide district, or a majority Anglo school district, will not necessarily be successful in a large urban district such as the DISD. As the Supreme Court observed in *Brown II,* supra, 349 U.S. at 299, 75 S.Ct. at 756, 99 L.Ed. at 1105:

> Full implementation of these constitutional principles may require solution of varied local school problems. School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles. Because of their proximity to local conditions and the possible need for further hearings, the courts which originally heard these cases can best perform this judicial appraisal.

Throughout the proceedings on remand, this Court has held foremost in its mind the unique characteristics of the DISD, in order to insure that a feasible, workable plan is adopted which will realistically establish a unitary system in the DISD.

The Fifth Circuit remanded this case with instructions to formulate a new "student assignment plan." The DISD has maintained throughout these proceedings that the Court can consider nothing except a bare-bones student assignment plan. Although this Court recognizes that the mandate from the Fifth Circuit referred consistently to formulating a "student assignment plan," it does not interpret that language as limiting this Court to a plan which merely provides for moving bodies between buildings. As the Fifth Circuit held in *Calhoun v. Cook,* 522 F.2d 717 (1975), rehearing denied, 525 F.2d 1203 (1975):

> The aim of the Fourteenth Amendment guarantee of equal protection on which this litigation is based is to assure that state supported educational opportunity is afforded without regard to race; it is not to achieve racial integration in public schools.

A student assignment plan cannot operate in a vacuum; it must include whatever additional tools are necessary to carry out the mandate that equal educational opportunity be provided, and to insure that a truly unitary system is established.

■ In adopting a student assignment plan, this Court is required to arrive at a delicate balance—the dual nature of the system must be eliminated; however, a quota system cannot be imposed. The Supreme Court ruled in *Swann,* supra, 402 U.S. at 26, 91 S.Ct. at 1281, 28 L.Ed.2d at 572, that

> [t]he district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation and will thus necessarily be concerned with the elimination of one-race schools.

On the other hand, the Supreme Court held that

> [t]he constitutional command to desegregate schools does not mean that every school in every community must always

reflect the racial composition of the school system as a whole.

*Ibid,* at 24, 91 S.Ct. at 1280, 28 L.Ed.2d at 571.

■ In arriving at this balance, the practicalities of the situation are to be taken into account. *Davis v. School Commissioners of Mobile County,* 402 U.S. 33, at 37, 91 S.Ct. 1289, at 1291, 28 L.Ed.2d 577, at 580 (1970). These practicalities include travel time and distance, and the age of the children.

An objection to transportation of students may have validity when the time or distance of travel is so great as to either risk the health of the children or significantly impinge on the educational process . . . It hardly needs stating that the limits on time of travel will vary with many factors, but probably with none more than the age of the students.

*Swann,* supra, 402 U.S. at 30, 91 S.Ct. at 1283, 28 L.Ed.2d at 575.

■ The Fifth Circuit instructed this Court to use the techniques discussed in *Swann* to dismantle the vestiges of the dual nature of the DISD. The Supreme Court said in *Swann* that "[d]esegregation plans cannot be limited to the walk-in school," if this will not produce a unitary system. *Swann,* supra at 30, 91 S.Ct. at 1283, 28 L.Ed.2d at 575. All available techniques are to be considered in the formulation of student assignment plans, including the restructuring of attendance zones and the pairing of both contiguous and noncontiguous attendance zones. *Swann,* supra; *Davis,* supra.[5]

■ The Supreme Court's decision in *Swann* also emphasized the equitable nature of the remedies phase of a desegregation case. It quoted the following language from *Brown II:*

In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs.

*Swann,* supra at 12, 91 S.Ct. at 1274, 28 L.Ed.2d at 564. Later it stated:

In seeking to define even in broad and general terms how far this remedial power extends it is important to remember that judicial powers may be exercised only on the basis of a constitutional violation . . . As with any equity case, the nature of the violation determines the scope of the remedy.

This Court has kept in mind throughout these proceedings that its findings in 1971 were that the "vestiges" of a dual school system remained in the DISD, and not that the DISD was a dual system at that time. The plan adopted now must therefore remedy these vestiges without exceeding this Court's equitable powers to balance public and private needs.

Finally, guidance as to the role of this Court has been given by the Supreme Court in *Green,* supra, 391 U.S. at 439, 88 S.Ct. at 1695, 20 L.Ed.2d at 724:

The obligation of the district courts, as it always has been, is to assess the effectiveness of a proposed plan in achieving desegregation. There is no universal answer to complex problems of desegregation; there is obviously no one plan that will do the job in every case. The matter must be assessed in light of the circumstances present and the options available in each instance. It is incumbent upon the school board to establish that its proposed plan promises meaningful and immediate progress toward disestablishing state-imposed segregation. It is incumbent upon the district court to weigh that claim in light of the facts at hand and in light of any alternatives which may be shown as feasible and more promising in their effectiveness. . . . Moreover, whatever plan is adopted will require evaluation in practice, and the court should retain jurisdiction until it is clear

---

5. The pairing of noncontiguous attendance zones and the use of transportation is of course limited by the practicalities mentioned above.

that the state-imposed segregation has been completely removed.

With this task in mind, the Court heard testimony regarding the feasibility and effectiveness of these plans presented by the parties during hearings which lasted continuously from February 2 to March 5. All the plans utilize, to varying degrees, the concepts of pairing and clustering schools, and of transporting students for the purpose of establishing an integrated or unitary school system, as approved by the Supreme Court in *Swann,* supra. Each of the plans incorporates other tools, as well as transportation, to help insure that an integrated school system is achieved. The Court finds some meritorious suggestions in each of the plans, including the concept of magnet schools suggested by the DISD, the plaintiffs and others; the majority to minority transfer program advocated by all parties; and the concept of a monitor or auditor proposed by the plaintiffs, the NAACP and the Dallas Alliance Task Force. The Court is convinced that the plan of the Educational Task Force of the Dallas Alliance will effectively establish a unitary system of education in the DISD and that it "promises realistically to work now." *Green,* supra at 439, 88 S.Ct. at 1694, 20 L.Ed.2d at 724.

### III. *Present Characteristics of the DISD*

The most significant feature of the DISD now as opposed to 1971 is that the DISD is no longer a predominantly Anglo student school system. In the years which have intervened since this Court's 1971 order, the percentage of Anglos in the DISD has declined from 69% to 41.1%, and projections show no reversal of this trend to a predominantly minority district. According to the most recently compiled figures,[6] the racial composition of the DISD student body is 41.1% Anglo, 44.5% black, 13.4% Mexican-American, and 1.0% "other." In the 1970–71 academic year, the DISD enrolled 163,-353 students in grades 1–12, whereas in December, 1975, the DISD enrolled only 131,757 students. Over the past five years the DISD has lost, for one reason or another, 40.9% of its Anglo student population.[7]

Nevertheless, the DISD continues to be the eighth largest school district in the nation, covering an area of approximately 351 square miles. Its 180 separate campuses house 141,122 students (including kindergarten), and its total expenditure for the 1975–76 academic year is $164,788,000.

Although the DISD in 1975–76 cannot be considered to be wholly free of the vestiges of a dual system, significant strides in desegregation have been made since the Court's 1971 order as a result of natural changes in residential patterns in the past three years. In the 1970–71 school year, 91.7% of all black students in the DISD attended predominantly minority schools, whereas in the 1975–76 school year, the percentage has dropped to 67.6%. Testimony during the hearings showed that large areas of Dallas which formerly reflected segregated housing patterns are now integrated, namely Western Oak Cliff, Pleasant Grove, East Dallas, the area of North Dallas included in the attendance zone for Thomas Jefferson High School.[8]

Testimony also established that the DISD has undertaken in good faith and on its own to equalize the educational opportunity for all children during recent years. The plaintiffs introduced a 209-page *Report of a Study of Instruction in the Dallas Independent School District 1974–75* which was conducted by Dr. Francis S. Chase and eight staff associates. This report was initiated

---

6. Dec. 1, 1975, DISD *Hinds County* figures. See Appendix A for racial composition of each grade level.

7. An HEW Report shows that in October 1969 there were 97,103 Anglo students in grades 1–12, and in October 1975 there were 57,426 Anglo students in grades 1–12.

8. See Appendix B, an exhibit introduced by the Strom intervenors which shows the changes in racial composition of formerly predominantly Anglo secondary schools.

by the School Board, but Dr. Chase testified that he and his staff, who had no connection with the DISD, were not impeded in any way in conducting this study or presenting their findings. Their findings included the following passage:

The staff of the Study of Instruction has identified a number of characteristics in which the Dallas Independent School District is either pre-eminent or close to the top among public school systems. Some of these characteristics which hold high potential for the improvement of education are:

1. The commitment to, and the heavy investment of resources in, curriculum, design, development, and implementation.

2. A broadly conceived and well-staffed program of research and evaluation to define needs, inform decisions, assess the effectiveness of programs and services, and indicate deficiencies in program implementation or operation.

3. The creation of an extensive network of communications through which community organizations and large numbers of teachers, students, parents, and other citizens may learn about and participate in educational decisions and programs.

4. Frank acknowledgment of barriers to equal educational opportunity, followed by constructive measures such as the Affirmative Action Program, the extension of Multi-Ethnic Education, the implementation of Plan A for better treatment of learning disabilities, and support for inner-city school renewal projects.

5. The number and variety of innovations initiated and the continuing search for ways of responding to the demands for improved education.

6. The extensive program of personnel development through released time, other special programs, and four area teacher centers which work in cooperation with seven colleges and universities.

7. The planning, development, and operation of career education programs and emphases—with continuing efforts to extend and improve career education at all levels.[9]

In spite of the DISD's efforts, Dr. Chase's study concluded that there is still a gap between intent to provide equal educational opportunity and the achievement of this goal. But the study also concluded that the DISD is accepting the continuing challenge to speed progress and close this gap.

The Dallas Independent School District, in recent years, has acknowledged frankly the existence of persisting inequalities and inadequacies in its provisions for education. Instead of regarding these conditions as inevitable, the District has moved progressively to treat them as challenges with which it must cope swiftly and effectively. All school systems, and especially those in our larger cities, are faced with the urgent necessity of alleviating the learning disabilities which have their roots in poverty, prejudice, and other forms of discrimination. No other school district offers a better prospect for significant progress in this direction.[10]

The study thoroughly evaluated the DISD's programs, pin-pointing areas which needed improvement and making recommendations to that end.[11] Dr. Chase testified that this study was unique in the amount of response it elicited from the School Board and the Administration; he testified that there is not one item cited that the Board and Administration have not responded to in some way. His testimony was that there can never be a perfect school system, but that at least the DISD is conscientiously on the road to providing equal educational opportunity for all.

The plan which this Court is ordering to be implemented promises to continue this trend of desegregation and will, when fully

9. *Study of Instruction,* pp. 35–36.

10. *Ibid,* p. 200.

11. *Ibid,* pp. 205–209.

implemented, remove all vestiges of the former dual system in the DISD. The Court is convinced that this plan will, at the same time, "assure that state supported educational opportunity is afforded without regard to race." *Calhoun,* supra at 719. *Milliken v. Bradley,* 418 U.S. 717, 740–741, 94 ° S.Ct. 3112, 3125, 41 L.Ed.2d 1069, 1088–1089 (1974); *Alexander v. Holmes County Board of Education,* 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed.2d 19, 21 (1969); *Brown v. Board of Education,* 349 U.S. 294, 301, 75 S.Ct. 753, 756, 99 L.Ed. 1083, 1106 (1955).

## IV. *An Analysis of the Plans Before the Court*

### A. DISD's Plan

The DISD's plan was devised by the staff of the DISD under the direction and supervision of Dr. Nolan Estes. The district is divided into three categories for the purpose of student assignment—the integrated parts of the school district [12] the remaining predominantly Anglo parts of the district,[13] and certain minority parts of the district. The DISD's plan proposes to retain the present student assignment patterns for the naturally integrated areas,[14] as desegregation has already occurred in these areas.[15] Pairing and clustering techniques, both contiguous and noncontiguous, were used to desegregate grades 4–12 [16] of the predominantly Anglo areas of the district. The grade configurations were proposed to be:

K–3    Elementary Schools
4–5    Intermediate Schools
6–7    Middle Schools
8–9    Junior High Schools
10–12  Senior High Schools.[17]

The remaining predominantly minority areas of the districts would continue to be served by predominantly one-race minority schools.[18]

In addition, the DISD proposed to set up 17 magnet schools to serve the entire district. Ten of these magnets would be for the elementary level, and would offer "fundamental" programming [19] or "individually guided" programming.[20] Seven of the magnets would operate on the secondary level (grades 8–12 in six of the seven cases), and would offer a variety of programs oriented toward careers, the creative and performing arts,[21] transportation and technology,[22] and world cultures. These programs are all in existence now in the DISD and are proving extremely successful.[23]

Finally, the DISD's proposal included the retention of the majority to minority transfer program presently in existence in the DISD.

The analysis showed that 13,947 students would be transported for desegregation purposes,[24] and that the total cost to imple-

---

12. These areas are integrated due to residential housing patterns.

13. These areas lie generally across the far northern and eastern portions of the DISD.

14. "Integrated" was defined by the DISD as not more than 75% Anglos or more than 75% combined blacks and Mexican-Americans.

15. There are 55 schools meeting this criteria.

16. Grades K–3 would continue to attend schools closest their homes.

17. There are 72 schools in this category.

18. There are 48 schools in this category serving 42 attendance zones.

19. "Fundamental" programming was described as concentrating on reading, writing, and arithmetic, and being a highly structured environment.

20. "Individually guided" programming was described as using a diagnostic prescriptive approach in a highly flexible setting. There would be approximately one teacher for every 15 students, and the students would be able to move along at their own pace.

21. This magnet would be located near Fair Park and would have those cultural facilities available.

22. This magnet would be located at Love Field, the airport recently closed.

23. Skyline Career Development Center, serving grades 10–12, is recognized as one of the outstanding magnet schools in the nation.

24. In the Western Oak Cliff area, the DISD's proposal would transport 1500 black students to predominantly minority schools.

ment [25] would be $6,811,240, causing a 9¢ tax increase.[26]

### B. Plaintiffs' Plans

Plaintiffs' proposed plans were devised by the plaintiffs' attorneys, using guidelines laid down by Dr. Charles Willie of Harvard.

### 1. Plan A

Under Plan A, the DISD would be divided into seven elementary subdistricts. An attempt was made to have each school reflect the racial composition of that subdistrict. The naturally integrated elementary schools retained their present student assignment patterns.[27] All other schools were paired or clustered for grades 1–12.[28] The grade configurations proposed were grades K, 1–3, 4–6, 7–9, and 10–12.[29]

Plaintiffs proposed the use of magnet schools constructed in the inner city to draw Anglos into those areas. They suggested the retention of the majority to minority program. They suggested that the DISD expand and improve its in-service training program for faculty and staff. Finally, they proposed a system of accountability to insure that the DISD complies with this Court's order and with the goal of quality education for each student enrolled in public school.

An analysis of Plaintiffs' Plan A showed that approximately 69,000 students would be transported, and that the projected total cost to implement [30] would be $22,030,590, causing a 29.4¢ tax increase.

### 2. Plan B

Under Plan B, the DISD would be divided into eight elementary level subdistricts. The residentially integrated areas were not included in the new student assignment patterns.[31] One of the subdistricts would remain predominantly minority and would retain its present assignment patterns,[32] but would become a "model cluster" with enhanced facilities and programs. The other areas were paired and clustered to achieve desegregation.

In addition, Plan B calls for magnet schools in all schools which had a predominantly minority enrollment prior to this year to enhance the attractiveness of these schools.[33] Plan B proposes the expansion of the DISD's present bi-lingual program.[34] Other features such as the majority to minority transfer program, in-service training, and a monitor or system of accountability mentioned above would also be included in Plan B.

An analysis of Plan B showed that approximately 47,000 students would be transported under this plan. The estimated cost

---

**25.** This includes the cost of buses, bus monitors, building modifications, portable classrooms, and magnets.

**26.** Ch. 20.04d of the Texas Education Code, based on Art. 7 § 3 of the Texas Constitution, limits the assessment of school taxes for any school district in Texas to $1.50 per $100 property value. The tax rate for the DISD presently is $1.40 per $100 property value. Thus any plan which increases the taxation rate more than 10¢ would cause an increase in class size past the present 27 students, or else cause a reduction in enrichment programs.

**27.** There were 13 elementary schools in this category.

**28.** Kindergarten children would attend the schools closest their homes.

**29.** This was done wherever possible. Other grade configurations do appear, such as K, 1–4, 5–6, 7–9, 10–12.

**30.** DISD's projection based on the elements of Plan A, including cost of buses, bus monitors, building modification, and portable classrooms.

**31.** There are 39 elementary schools in this category.

**32.** This is the South Oak Cliff area, and included twelve elementary schools, two junior high schools, and one high school.

**33.** This would include renovations and curriculum revision.

**34.** Testimony from several experts indicated that the DISD's bi-lingual program is the best in the nation. Dr. Estes testified that the DISD is presently attempting to expand this program to all schools as rapidly as possible, but that the demand for bi-lingual instructors is presently greater than the supply.

of implementation [35] is $14,963,680, which would necessitate a 20¢ tax increase per $100 property value.

## C. NAACP Plan

The NAACP's proposal was drawn by Dr. Charles Hunter of Bishop College. It contained a number of concepts and proposals to be utilized by the DISD in implementing the plan, as well as a rough outline of schools to be paired and clustered to achieve desegregation. The naturally integrated areas were left with their present assignment patterns, and the rest of the schools were paired and clustered so that every school would have a racial balance comparable to the racial balance in the district (with a 10% variance up or down).[36] Innovative programs would be fostered in the inner city schools, as well as in magnet schools, which would operate on a district-wide basis. Among other suggestions, the NAACP plan proposed monitoring procedures which would be available to make adjustments in student assignments when changes in racial patterns are noted.

An analysis of the NAACP's plan indicated that approximately 40,000 students would be transported. The estimated partial cost [37] is $7,163,310, necessitating a 15½¢ tax increase for the buses and bus monitors alone.

## D. Dr. Hall's Plan

The student assignment plan submitted to the Court by Dr. Hall is similar to those of the DISD and Plaintiffs' Plan B, in that it divides the district into the categories of residentially integrated areas,[38] paired and clustered areas, and predominantly minority areas. The naturally integrated areas would retain their present assignment patterns.[39] Schools in predominantly Anglo areas are paired and clustered with schools in predominantly minority areas to the greatest degree possible.[40] The grade configuration for this category of schools is K–1 (nearest schools), 2–5, 6–7, 8–9, and 10–12. If the time and distance proved to be too great, then the schools would retain their present assignment patterns.[41]

In addition, Dr. Hall proposed the establishment of Early Childhood Centers in Title I [42] areas. These centers would be for ages 5 and 6, and hopefully age 4, and would provide enriched programs, using State and Federal Compensatory Education funds, with a pupil-teacher ratio of approximately 20–1. Additional personnel would also be provided as well. Dr. Hall also recommended using these centers as Community centers.

Dr. Hall recommended the continuation of the DISD Metropolitan Learning Centers for secondary school students who do not respond to the traditional school setting.

---

**35.** Using the same criteria mentioned above.

**36.** The NAACP proposed to achieve racial balance between blacks and Anglos first and then follow with other minorities.

**37.** It was not possible to give an estimated total cost because expenditures for building modification, moving portables and equipment could not be determined under their plan.

**38.** Dr. Hall's guideline for determining an integrated school is no more than approximately 75% nor less than approximately 30% of combined minority groups.

**39.** There are approximately 55 schools in this category.

**40.** The factors of time and distance were taken into account by all parties—the DISD and Dr. Hall limited time of transportation to 30 minutes each way. The Plaintiffs strove for this,

but acknowledged that in their plans greater time was involved. The NAACP's plan limited time of transportation to 40 minutes.

**41.** The statistics regarding time and distance on these schools were carefully documented. There are 34 predominantly minority schools in this category. Five of the schools were elementary schools who would move on to integrated junior high and high schools. The schools in this category were considered by Dr. Hall to be superior schools (with the exception of renovation at three schools) in terms of facilities and the environment in which the schools are located. Nineteen of the schools in this category were at one time predominantly Anglo schools.

**42.** This refers to funds provided for certain areas under the Elementary and Secondary Education Act of 1965.

He suggested maintaining the present magnet school of Skyline Center for Career Education, and expanding the magnet concept wherever possible.

An analysis of Dr. Hall's plan indicates that approximately 20,000 students would be transported for desegregation purposes. The estimated cost of his plan[43] would be $7,163,310, and would necessitate a tax increase of 9.6¢.

### E. The Dallas Alliance Plan

The student assignment plan proposed to the Court by the Dallas Alliance Task Force on Education utilizes many of the concepts or tools used in the other plans, and also introduces new concepts. Like the plaintiffs' plans, the Alliance plan divides the DISD into smaller subdistricts. These attendance areas or subdistricts would in general reflect the Northwest, Northeast, Southeast, South Oak Cliff, and Southwest geographical sections of the district. Every subdistrict except South Oak Cliff would have approximately the same student population and would have minority ratios which would approximate that of the whole DISD, plus or minus 5%. Grade levels would be standardized on a K–3, 4–8, 9–12 basis. For grades K–3, new attendance zones would be drawn to achieve as much natural desegregation as possible, and students would be assigned to the nearest school which would promote integration, not to exceed four miles from home. Attendance zones in K–3 would not necessarily consider the five attendance zones.

On the K–3 level, special teaching strategies and enriched program options would emerge for students in all areas. The Alliance plan proposes that efforts to maximize parent involvement following the Early Childhood Education model from California be introduced in September 1976 and completed by September 1979. This K–3 approach would be primarily diagnostic-prescriptive. It would result in an adult-student ratio in instruction of approximately 1–10. (Adult is a teacher aide, a parent, an older student tutor, etc.)

For grades 4–8, students would only be assigned to schools within the attendance subdistrict in which they live. Areas that are naturally integrated would retain their present student assignment patterns (except that 8th grade would be added to the lower grades). Students in areas that are not naturally integrated would attend schools in the center of each subdistrict in which they live, in a manner so that each school's minority ratio reflects the minority ratio of the 4–8 student population of the area, plus or minus 10%. Magnet schools for 4–8 would also be established, with a priority on magnets in the South Oak Cliff area. The magnets would be open to all 4–8 students in the DISD on a voluntary basis. The magnets would also reflect the minority ratios of the 4–8 student population in all areas (with the exception of South Oak Cliff), with allowance for a 10% plus or minus variation from the percentage of all minority students in the DISD.

For grades 9–12, the Dallas Alliance proposes Magnet High Schools and Magnet Comprehensive High Schools.[44] These would be open to all 9–12 students on a voluntary basis, but with minority ratios of the 9–12 student population of the DISD, with allowance for a 10% plus or minus variation from the percentage of all minority students in the DISD. Partnerships and working relationships between institutions of higher learning, the business and the cultural communities would be encouraged with each magnet high school. During the 1976–77 school year, at least four additional magnets would be opened in the central area of the city,[45] and *at least* three additional magnets would be established by

---

43. This cost estimate was again provided by the DISD using the same criteria mentioned above.

44. A Magnet Comprehensive High School includes regular high school curriculum as well as special career and other programs.

45. These were suggested as

1) a new magnet comprehensive Lincoln High School, costing approximately $14,500,-000

2) a magnet for Business Education and Management at Crozier Tech, established in

1979–80. Each magnet would accommodate a minimum of 1,000 students, and would open as rapidly as it fills. Seven magnets would be therefore considered a minimum, not a maximum number to be implemented. Until all students attend magnet high schools, grades 9–12 would attend the nearest area high school in the subdistrict in which the students live.

Aside from student assignment concepts embodied in the K–3, 4–8, and magnet 9–12 arrangement, the Alliance plan addresses itself to other facets of a unitary school system. With regard to personnel, it proposes the development of recruiting and employment policies to insure that competent personnel are employed at all levels and that the percentages of white, black and brown administrators, principals, teachers approximate DISD-wide the respective percentages of those races represented in the City of Dallas in 1976, as a minimum, within three years. The DISD would rely on expanded scope of positions, reassignment, and attrition to meet that goal. It proposes that the top salaried line administration positions (currently established at 185 in number) reflect the percentages of the ethnic makeup of the DISD student population (approximately 44% Anglo, 44% black, and 12% Mexican-American) by 1979. This transition would occur on a schedule of one-third by 9/1/77, one-third by 9/1/78, and one-third by 9/1/79.

The Alliance plan also proposes training for teachers to improve their proficiency and their ability to perform in a multicultural setting, assessment on a regular basis of the competence of personnel, and a system of internal and external accountability measures to insure that a unitary system was in fact achieved.

Although the exact numbers of students transported and the exact cost could not be determined,[46] it has been established by the DISD that approximately 20,000 students would be transported at a cost of $5,830,000, necessitating a tax increase of 7.8¢. The funds for the capital expenditure of $16,-500,000 for magnet schools the first year could be accommodated by the present bond issuance, without any additional tax increase. The annual operating cost of this plan has been estimated at $5,000,000. This plan therefore is economically feasible without the increase in class size or decrease in established programs.

## V. The Plan to be Implemented

■ The Court has carefully considered the various concepts suggested in the plans briefly summarized above, and finds that the following tools will be most effective in addressing and solving the problem of vestiges which remains in this large urban district of ours.

### A. The Subdistrict Concept

Several experts, including the plaintiffs' Dr. Charles Willie, testified that with a city as large as Dallas, a series of subdistricts (each with elementary, middle, and high schools) is more effective than one large district. This will give parents and students a sense of community and control over their schools, which the Supreme Court has recognized as so important to the successful functioning of our schools.

No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process. See *Wright v. Council of City of Emporia,* 407 U.S. 451, at 469, [92 S.Ct. 2196, 2206, 33 L.Ed.2d 51]. Thus, in *San Antonio School District v. Rodriguez,* 411 U.S. 1, 50, [93 S.Ct. 1278, 1305, 36 L.Ed.2d 16] (1973), we observed that local control

---

cooperation with the businesses in the Central Business District (the downtown Dallas area)

3) a magnet for the creative arts of Madison High School, due to its proximity to the Fair Park Music Hall and other cultural facilities

4) a magnet for aviation training at Love Field, the airport partially closed due to the opening of the Dallas-Fort Worth Regional Airport, etc.

**46.** The administration and staff of the DISD need to work out the details of this plan.

over the educational process affords citizens an opportunity to participate in decisionmaking, permits the structuring of school programs to fit local needs, and encourages "experimentation, innovation, and a healthy competition for educational excellence."

*Milliken v. Bradley,* 418 U.S. 717, at 742, 94 S.Ct. 3112, at 3125, 41 L.Ed.2d 1069 at 1089 (1974). Moreover, it helps minimize the transportation distance and time, since this is limited to each subdistrict.[47]

Each subdivision will approximate the racial makeup of the DISD as a whole, with the exception of South Oak Cliff.[48] Due to the geographic layout of the DISD, and the factors of time and distance, this South Oak Cliff area was left predominantly black in every plan proposed to the Court, with the exception of Plaintiffs' Plan A, which proposed to establish an exact racial balance in every school and which would have necessitated the transportation of 49,000 students. The Court is of the opinion that, given the practicalities of time and distance, and the fact that the DISD is minority Anglo, this subdistrict must necessarily remain predominantly minority or black. However, this does not mean that the goal of equal educational opportunity for all cannot be achieved. In terms of facilities, Dr. Hall testified that with the exception of Budd and Harllee Elementary Schools and the site at Roosevelt High School, the facilities in this area can be categorized as superior. Additionally, Dr. Hall testified that the environment in which each center is located, i. e., the property immediately adjacent to the schools, as well as the residential area served by them, can be classified as superior. Dr. Hall testified that educational opportunities in terms of facilities or programs would not be improved by complete redistribution of all pupils, and in some situations, they would be lessened.

With the renovation of some of the facilities in this area, this subdistrict could be a model for the district and the nation, and attract Anglos to it on the basis of its superior programs and facilities.

B. The K–3 Diagnostic-Prescriptive Concept

The Court adopts the Dallas Alliance' concepts regarding grades K–3 for a number of reasons. As the Supreme Court observed in *Swann,* the most important factor to consider in implementing a transportation plan is the age of the children in relation to the time and distance travelled. Dr. Estes testified that the DISD's plan left the K–3 grades in the schools nearest their homes due to the fact that the children had not matured sufficiently to cope with the problems of safety and fatigue associated with significant transportation. The Court finds that this conclusion is sound, in terms of age, health, and safety of children in grades K–3.

Furthermore, there appears to be no deprivation of the right of the minorities to equal educational opportunities on the K–3 level. As Dr. Chase testified, the disparity, if any, is in favor of the lower socio-economic areas on the K–3 level, due to the special programs and efforts of the DISD in those areas.

Finally, the diagnostic-prescriptive concept so successfully used in California will insure that children everywhere in the district will be afforded equal educational opportunity and that any remaining vestige of a dual system (if it in fact exists on the K–3 level) will be eliminated.

C. The 4–8 Central Area Concept

The concept of locating grades 4–8 close to the center of each Area or Subdistrict is based on pragmatic considerations. Trans-

---

**47.** Magnet schools would be on a city-wide basis, however.

**48.** Estimates show that the racial makeup would be as follows:

| | | Anglo | Black | Mexican-American |
|---|---|---|---|---|
| I. | Northwest | 44% | 39% | 16% |
| II. | Northeast | 41% | 42% | 17% |
| III. | Southeast | 46% | 46% | 8% |
| IV. | South Oak Cliff | | 98% | 2% |
| V. | Southwest | 42% | 27% | 31% |

portation distance and time will be minimized for all students in these grades, no matter where they live in each subdistrict. By bringing all students in each subdistrict together in these grades, the plan assures that no group is deprived of equal educational opportunity. By locating special magnet programs in the South Oak Cliff area in grades 4–8, this area will attract students of all races from the district as a whole, and will insure that this area is not deprived of educational opportunities.

### D. The 9–12 Magnet Concept

The magnet concept, widely used in other school districts, attracts students because of special career, vocational, or other programs that the magnet school offers. It is undisputed that the Skyline Career Development Center, which offers a myriad of career-oriented programs, is a model for the nation and that it demonstrates the success magnet schools can have in drawing students of all races and in offering quality education for all.[49]

Moreover, this Court must adopt a plan which promises to be *effective* in eliminating the vestiges of a dual system. The Court is convinced that the magnet school concept on the 9–12 grade level will be more effective than the assignment of students to achieve a certain percentage of each race in each high school. The Court tried this method of student assignment in 1971, and it has not proven wholly successful in achieving the goal of eliminating the

vestiges of a dual system in these grades. The evidence shows that of approximately 1,000 Anglos ordered to be transported to formerly all-black high schools under this Court's 1971 student assignment plan, fewer than 50 Anglo students attend those schools today. Whatever the cause might be for the non-attendance of Anglos in those schools today,[50] this Court finds that it can in no way be attributed to official actions on the part of school authorities.

While some blacks are still transported today to previously all-Anglo schools, these students could continue to do so under the majority to minority program, or could attend any magnet high school in the district. It should also be noted that changes in demographic patterns have resulted in the drastic reduction of predominantly Anglo high schools in the DISD.

The most realistic, feasible, and effective method for eliminating the remaining vestiges of a dual system on the 9–12 level, and for providing equal educational opportunity without regard to race, is the institution of magnet schools throughout the DISD. In this way, students of all races will join in working in areas of their special interest. Although these magnet schools cannot be created with the wave of a wand, they can be established at an accelerated pace with the help, financial and otherwise, of the business community of Dallas. The Court requests and sincerely believes that the business community will provide its resources and talents to help the DISD in this

---

**49.** The student body at Skyline presently reflects an ethnic population of approximately 60% Anglos, 33% blacks and 6% Mexican-Americans.

**50.** As a result of the offer of evidence of the Curry intervenors, the battle of the sociological experts developed. The Curry intervenors took the position that a "forced busing" order would cause resegregation and a further reduction of the Anglo student population of the DISD. Plaintiffs responded that desegregation orders, even those including "forced busing," are not the prime factor in a decrease in Anglo school population. Whatever may be the strength or weakness of the opinions of these experts and the bases on which such opinions were reached, the fact remains that in the DISD between the 1971 desegregation order and to-

day the Anglo student population has decreased by approximately 40,000. It is a well-settled principle of law that "the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them." *Brown II,* 349 U.S. at 300, 75 S.Ct. at 756, 99 L.Ed. at 1106. Nevertheless, this Court cannot control the prejudice or anti-busing sentiment which might exist in the minds of some private individuals. The mandate of the Supreme Court is to adopt the plan which promises realistically to be most effective, and after our experience with the 9–12 level, this Court is of the opinion a magnet school approach will accomplish this goal. See *Mapp v. Board of Education,* 525 F.2d 169 (6th Cir. 1975).

way. The Adopt-a-School program, presently operated by the DISD and such major corporations as Xerox and Bell Telephone, provides an example of what can be achieved through the cooperation of DISD administrators and educators on the one hand, and the business, educational, and cultural communities on the other hand. With the creation of this network of magnet schools, there can be no doubt that all vestiges of a dual system are eliminated.

### E. The Concept of Naturally Integrated Areas

As mentioned above, there is a substantial number of schools in the DISD in which the racial makeup of the student population reflects naturally integrated housing patterns. Two groups of intervenors represent parents and students living in several of these residentially integrated areas—namely the Strom intervenors, representing Western Oak Cliff and Pleasant Grove, and the Brinegar intervenors, representing East Dallas. These intervenors maintain that where integration in schools has been achieved through natural housing patterns, the present student assignments should be retained, since no vestiges of a dual system remain in these areas. The Court is in agreement with this concept. There is no denial of the right of educational opportunity in these areas, and, as all parties recognized, there would be no benefit, educational or otherwise, in disturbing this trend toward residential integration.[51]

### F. The Concept of Accountability

As the Supreme Court recognized in *Green,* supra, 391 U.S. at 439, 88 S.Ct. at 1695, 20 L.Ed.2d at 724, "whatever plan is adopted will require evaluation in practice . . . ."

A system of accountability performs three general functions:

1) it informs the Superintendent and the School Board how the administration is responding to the goals and objectives of the plan;
2) it provides the Court with an objective evaluation of the DISD's compliance with the ordered plan;
3) it informs the citizenry and serves as a tool for constructive input.

The Court is adopting the Alliance plan's concepts of accountability. Regarding the internal monitor, it will be acceptable for the DISD's Research and Development Department[52] to report to the Court. This report shall be on December 15 and April 15 of the year, until a showing that a unitary system has been achieved. This report should include:

1. The number and percentage of pupils by ethnicity attending each educational center, including magnet schools.
2. The number and percentage of pupils by ethnicity being transported for desegregation purposes.
3. The number and percentage of pupils by ethnicity obtaining majority to minority transfers (including the exception for Mexican-American students).
4. The number and percentage of teachers by ethnicity assigned full time in each educational center.
5. The number and percentage of new teachers, administrators, and teacher aides by ethnicity engaged by the DISD.
6. The current status of capital outlay projects.
7. The status of Early Childhood Education program.
8. The results of the annual standardized achievement tests program by school, grade, and ethnicity (April 15 report only).

51. The Brinegar intervenors pointed up the fact that since the Dallas Alliance plan does not yet detail student assignments, it is difficult to determine its impact on the integrated areas. The Court recognizes this problem, and will provide a one-week period after the student assignment portions of the plan are filed with the Court as hereinafter directed, for recommended modifications, if any, regarding the naturally integrated areas.

52. If the DISD wishes to develop some other monitor or unit to report to the Court, it is free to do so.

9. Efforts made by the system to successfully implement the order of this Court in the following areas:

a. Parent involvement efforts

b. Staff development activities

c. Communications and community relations programs

d. Student leadership training programs

(April 15 report only).

Subject to the approval of the selection by the Court, the DISD shall also secure the service of an independent professional firm to evaluate compliance with this order and the efforts to achieve a unitary system by the DISD. Such report should be filed with the Court annually on April 15, until a showing is made that a unitary system has been achieved. The criteria for monitoring suggested by the Alliance plan should be used as guidelines for this external monitor.

The Tri-Ethnic Committee established by the Court's 1971 order has served as community monitor for the Court, the School Board, Superintendent, and the public regarding compliance with that order. The Tri-Ethnic Committee will continue its efforts in this regard with the same powers, duties, and responsibilities provided in the Court's 1971 order except that it is relieved of any duty to select independent evaluation services from outside the DISD.

Finally, the Court is aware of the fact that demographic changes may necessitate revisions in student assignments in the future. Therefore the Court will retain Dr. Josiah Hall as an advisor to the Court and may call on him to recommend revisions or to review recommendations of the DISD regarding future student assignment.

### G. Personnel Concepts

It is well-settled that school administration and personnel play an important role in the achievement of a unitary school system. Administrators and personnel must be responsive to the needs of all racial groups, and must not discriminate against any group on the basis of race. In order to achieve and maintain a truly unitary DISD, the Court is adopting the personnel concepts of the Alliance plan. The Court is aware that training programs for teachers, principals and administrators already exist in the DISD. Naturally, these programs should be continued.

### H. Majority to Minority Transfer Concept

None of the parties dispute the usefulness of this tool in providing educational opportunity without regard to race. This program will remain in effect for all grade levels under the guidelines presently utilized by the DISD,[53] with the exception that minority to majority transfers will be allowed in instances where Mexican-Americans comprise less than 5% of the originally assigned school. This exception will be allowed in order that the bi-lingual education program will be available to all Mexican-American students who need it.

### VI. Conclusion

The DISD has acted in good faith since this Court's order in 1971 and has made reasonable efforts to fulfill the obligations imposed by that order. The DISD has further taken good faith steps to eradicate inequality in educational opportunity which has previously existed in the DISD. Had the DISD not shown a willingness to improve the quality of education for all its students, and especially those in the minority areas which previously had been neglected, this Court might feel impelled to adopt a different remedy. However, the vestiges of a dual system remaining in the DISD can be realistically and effectively eradicated by the implementation of the plan adopted herein. This will not mean that the DISD will be perfect, for school districts are run by mere mortals, and judicial decrees can make them no more. It will mean that the DISD has fulfilled its obligation, under the

53. The use of the four-day school week for majority to minority transfer students shall be discontinued.

Equal Protection Clause of the Fourteenth Amendment to the Constitution, that state-supported educational opportunity be afforded without regard to race.

Accordingly, it is ORDERED by the Court that the modified plan of the Educational Task Force of the Dallas Alliance filed with the Court on March 3, 1976, is hereby adopted as the Court's plan for removal of all vestiges of a dual system remaining in the Dallas Independent School District, and the school district is directed to prepare and file with the Court a student assignment plan carrying into effect the concept of said Task Force plan no later than March 24, 1976.

## APPENDIX A

### Ethnic Composition of the DISD

| Grade Level | Anglo | % | Black | % | Mexican-American | % | Other | % | Total |
|---|---|---|---|---|---|---|---|---|---|
| K | 3254 | 34.8 | 4429 | 47.3 | 1595 | 17.0 | 87 | .9 | 9365 |
| 1 | 4260 | 36.7 | 5274 | 45.5 | 1955 | 16.9 | 113 | 1.0 | 11602 |
| 2 | 4095 | 36.9 | 5080 | 45.7 | 1822 | 16.4 | 104 | 1.0 | 11101 |
| 3 | 3947 | 36.7 | 5056 | 46.9 | 1648 | 15.3 | 118 | 1.1 | 10769 |
| 4 | 3756 | 35.5 | 5098 | 48.1 | 1608 | 15.2 | 131 | 1.2 | 10593 |
| 5 | 4226 | 37.5 | 5251 | 46.6 | 1672 | 14.8 | 125 | 1.1 | 11274 |
| 6 | 4543 | 39.3 | 5394 | 46.6 | 1504 | 13.0 | 128 | 1.1 | 11569 |
| 7 | 4853 | 41.0 | 5356 | 45.2 | 1532 | 12.9 | 103 | .9 | 11844 |
| 8 | 5039 | 42.2 | 5343 | 44.8 | 1438 | 12.1 | 115 | 1.0 | 11935 |
| 9 | 5231 | 43.5 | 5406 | 45.0 | 1286 | 10.7 | 100 | .8 | 12023 |
| 10 | 5287 | 45.4 | 4943 | 42.5 | 1259 | 10.8 | 155 | 1.3 | 11644 |
| 11 | 4828 | 51.5 | 3526 | 37.5 | 936 | 10.0 | 93 | 1.0 | 9383 |
| 12 | 4704 | 58.7 | 2611 | 32.6 | 634 | 7.9 | 71 | .8 | 8020 |
| TOTAL | 58023 | 41.1 | 62767 | 44.5 | 18889 | 13.4 | 1443 | 1.0 | 141122 |

## APPENDIX B

### Ethnic Percentages for Integrated Dallas Jr. High Schools

| Jr. High | Year | Anglo | Black | Mexican-American |
|---|---|---|---|---|
| Atwell | 1970 | 82.0% | 16.6% | 1.1% |
|  | 1975 | 34.6% | 61.7% | 2.9% |
| Browne | 1970 | 97.6% | 0.1% | 1.7% |
|  | 1975 | 45.0% | 46.5% | 7.6% |
| Cary | 1970 | 89.0% | 2.8% | 7.9% |
|  | 1975 | 63.0% | 18.1% | 17.4% |
| Comstock | 1970 | 90.5% | 1.3% | 8.0% |
|  | 1975 | 24.1% | 59.8% | 16.0% |
| Florence | 1970 | 96.8% | 0.1% | 2.9% |
|  | 1975 | 73.3% | 19.4% | 7.1% |
| Franklin | 1970 | 98.3% | 1.0% | 0.5% |
|  | 1975 | 75.2% | 22.0% | 2.1% |
| Gaston | 1970 | 96.9% | 0.0% | 2.9% |
|  | 1975 | 76.7% | 16.4% | 6.0% |

### Ethnic Percentages for Integrated Dallas High Schools—Continued

| Jr. High | Year | Anglo | Black | Mexican-American |
|---|---|---|---|---|
| Greiner | 1970 | 85.6% | 0.3% | 13.5% |
|  | 1975 | 50.7% | 12.3% | 35.3% |
| Hill | 1970 | 98.1% | 0.0% | 1.6% |
|  | 1975 | 83.2% | 12.3% | 3.5% |
| Hood | 1970 | 96.9% | 0.0% | 3.1% |
|  | 1975 | 66.0% | 28.4% | 4.3% |
| Hulcy | 1970 | 92.4% | 0.2% | 6.9% |
|  | 1975 | 16.2% | 79.6% | 3.9% |
| Long | 1970 | 85.4% | 5.2% | 8.9% |
|  | 1975 | 63.2% | 17.3% | 19.0% |
| Marsh | 1970 | 97.9% | 0.6% | 1.2% |
|  | 1975 | 84.6% | 12.2% | 2.4% |
| Rusk | 1970 | 45.9% | 24.5% | 29.4% |
|  | 1975 | 25.3% | 21.2% | 51.4% |
| Rylie | 1970 | 96.5% | 0.0% | 3.2% |
|  | 1975 | 91.5% | 1.5% | 6.6% |
| Spence | 1970 | 24.4% | 35.0% | 39.8% |
|  | 1975 | 20.6% | 25.1% | 53.3% |
| Stockard | 1970 | 84.6% | 0.0% | 14.6% |
|  | 1975 | 60.8% | 5.7% | 32.1% |
| Walker | 1970 | 81.2% | 17.4% | 1.1% |
|  | 1975 | 78.2% | 20.5% | 0.9% |

### Ethnic Percentages for Integrated Dallas High Schools

| School | Year | Anglo | Black | Mexican-American |
|---|---|---|---|---|
| Bryan Adams | 1970 | 99.2% | 0.0% | 0.6% |
|  | 1975 | 86.0% | 7.6% | 4.5% |
| Adamson | 1970 | 73.3% | 7.4% | 16.8% |
|  | 1975 | 29.3% | 48.9% | 19.6% |
| Carter | 1970 | 96.6% | 0.0% | 3.1% |
|  | 1975 | 30.9% | 65.2% | 3.8% |
| Hillcrest | 1970 | 98.6% | 0.5% | 0.7% |
|  | 1975 | 82.5% | 15.0% | 1.2% |
| Jefferson | 1970 | 92.0% | 2.6% | 5.2% |
|  | 1975 | 70.0% | 19.3% | 12.7% |
| Kimball | 1970 | 96.6% | 0.1% | 2.9% |
|  | 1975 | 62.5% | 28.6% | 8.0% |
| No. Dallas | 1970 | 30.0% | 42.7% | 28.6% |
|  | 1975 | 17.5% | 30.8% | 51.2% |
| Samuell | 1970 | 97.8% | 0.1% | 2.1% |
|  | 1975 | 82.5% | 12.0% | 5.3% |

### Ethnic Percentages for Integrated Dallas Jr. High Schools—Continued

| School | Year | Anglo | Black | Mexican-American |
|--------|------|-------|-------|------------------|
| Seagoville | 1970 | 79.7% | 15.9% | 4.3% |
|  | 1975 | 79.9% | 15.4% | 4.5% |
| Skyline | 1970 | 94.0% | 2.3% | 3.0% |
|  | 1975 | 60.1% | 33.6% | 5.9% |
| Spruce | 1970 | 96.5% | 0.3% | 3.2% |
|  | 1975 | 65.1% | 26.9% | 7.5% |
| Sunset | 1970 | 88.8% | 0.0% | 9.4% |
|  | 1975 | 57.4% | 8.5% | 33.0% |
| White | 1970 | 98.3% | 0.6% | 0.9% |
|  | 1975 | 82.6% | 14.8% | 1.9% |
| Wilson | 1970 | 88.8% | 4.3% | 6.5% |
|  | 1975 | 62.6% | 19.9% | 15.9% |

## SUPPLEMENTAL OPINION AND ORDER

The Court has before it two motions to alter or amend its March 10, 1976, opinion and order, submitted by the Defendant DISD and by the Plaintiffs. The Court also has before it comments of the Brinegar and Strom intervenors regarding the student assignment plan submitted by the DISD on March 24, 1976. The Court will not address the comments of these intervenors in this supplemental opinion, as they are dealt with in the Final Order entered this date in this case. The Court does feel it necessary, however, to respond to the motions of the initial parties to this proceeding.

### A. *The DISD's Motion*

The DISD asks the Court to do two things: 1) approve all aspect of the approach, guidelines, standards, and interpretations made by the Defendants as to the student assignment plan prepared and filed by the DISD on March 24, 1976, and 2) accept the student assignment plan as being in compliance with the Court's opinion and order of March 10, 1976.

As to the first request, the Court is unable to approve the DISD's student assignment plan in toto. The Court has received and thoroughly considered suggestions made by various intervenors and by the Amicus Curiae Educational Task Force of the Dallas Alliance subsequent to the submission of the DISD's student assignment plan on March 24. The Court is of the opinion that many of these suggestions have merit and should be reflected in the student assignment plan. The Court has thus modified the document submitted by the DISD to incorporate many of these suggestions. It has further incorporated modifications to the student assignment plan which the Court deems necessary in order that the spirit of the Dallas Alliance's plan will be implemented to the fullest extent possible. These changes appear in the Final Order entered this day.

Through its second request the DISD asks essentially that the Court omit from the desegregation plan for the DISD any reference to non-student assignment matters, including course offerings, personnel, facilities and provisions for accountability. The Court will not hesitate to say that it taxes the Court's patience to have this objection raised again, after it was overruled time after time during the hearings, and after the Court specifically adopted the concepts embodied in the Dallas Alliance's plan regarding these matters on March 10. If the Court's response to this objection has not yet registered in the minds of the Defendants, it is this: a student assignment plan can not operate in a vacuum, and a unitary school system can not be achieved solely by mixing bodies. This Court is bound by the Constitution and by the body

of caselaw in this field to see that the DISD provides *equal educational opportunity* for all its students, and the Court must necessarily be concerned about areas other than student assignment when it carries out this duty.

It is to be recalled that the Court's 1971 Order contained directives other than a bare-bones student assignment plan. In 1971, this Court had occasion to comment on the fact that the Fifth Circuit Court had found it necessary to enter specific non-student assignment orders to meet the many schemes and devices that school boards practiced in order to evade their constitutional obligation to provide equal educational opportunity. Among these, of course, were orders providing for desegregation of faculty and staff, site-selection, transportation provided to students, and course offerings. To indicate the extent to which Courts have found it necessary to go to insure equal education, the Court would point out that in Boston the Court found it necessary to appoint a receiver to take over the operation of a school.

So that there can be no mistake about this matter the Court will state once again: it has no interest in "running the school district" or in playing the role of dictator to the School Board or Dr. Estes and his staff. However, the Court will not stand aside where the DISD has been found to operate a dual school system which discriminates between Anglo and minority schools, as was found in 1971 and as was reemphasized in the disparity shown in Dr. Chase's report and other evidence introduced during the recent hearings. The DISD must provide equal educational opportunity for all its students, in non-student assignment matters as well as in the area of student assignment.

The DISD's motion to alter or amend the Court's Opinion and Order of March 10 is therefore in all respects denied.

### B. *The Plaintiffs' Motion*

In its motion, the Plaintiffs ask the Court to amend or clarify its March 10 opinion in three areas: 1) its finding regarding the Chase Report of a Study of Instruction in the DISD 1974–75, 2) its finding regarding K–3 children and their ability to be transported for desegregation purposes, and 3) its finding regarding the good faith of the DISD after 1971.

With regard to the first item, the Court is quite aware that one of the central findings of the Chase Report was that a disparity remains between the predominantly Anglo centers and the predominantly minority centers in the areas of (a) facilities, (b) staffing patterns, and (c) educational offerings. The Court adopted these findings of Dr. Chase on page 9 of its Opinion when it said ". . . there is still a gap between intent to provide equal educational opportunity and the achievement of this goal."

The Court is of the opinion that the DISD can and must correct these disparities—that is what "providing equal educational opportunity" is all about. The Court believes that the plan entered this date offers the greatest promise for actually insuring that no child in the DISD is discriminated against in the type of education he receives.

With regard to the second item, the Court will make clear that there were a number of factors that influenced the Court to adopt the K–3 Early Childhood Education concept using the diagnostic-prescriptive approach to early education. The primary reason for adopting this approach is that the Court is convinced that parental involvement and individualized instruction is invaluable at this age. The question of a child's maturity and ability to cope with being transported will of course vary with each child, and educators' opinions vary as to what is a "reasonable" age to begin transportation of children. Indeed, several educators, including Dr. Hall, testified that children could be transported as early as the first or second grade without any detrimental effect. The Court is of the opinion however, that due to the educational benefits inherent in the early Childhood Education program, children in grades K–3 will be best served by having the parental and community involvement which is made possible by remaining in neighborhood schools.

Plaintiffs' third request deals with the finding by the Court that the DISD acted in good faith after 1971. By that finding the

Court showed its awareness of some of the efforts of the DISD to provide better educational opportunities for students in predominantly minority schools. As Dr. Chase pointed out, some of the best schools in this school system are in predominantly minority areas. This is not to say, however, that the DISD has accomplished everything that it could have accomplished had it vigorously implemented the "Confluence of Cultures" program. Nor is this to say that disparity does not now exist between some schools. And, in the light of recent actions of the School Board which appear to seek the dilution of the expressed intention of the Court regarding equal educational opportunity, one wonders whether the establishment of a unitary school system and the provision of equal educational opportunity is in fact being pursued in good faith.

The conduct of the School Board members and the DISD administration in the months and years to come will answer that question. This Court sincerely hopes that every member of this community will have no hesitation in saying that the DISD has implemented this Order to the fullest extent and has done so in utmost good faith.

The final Order this day entered answers some of Plaintiffs' suggestions regarding the plan to be implemented, and this Supplemental Opinion and Order is intended as a clarification, where deemed necessary of the Court's March 10 Opinion and Order.

### C. Conclusion

The Court believes that unique opportunity is available to the DISD to desegregate without undue disruption and at the same time to provide a model of quality education for all. It is time for all parties to cast a statesman-like eye on the future of Dallas in light of the reality of the requirement to desegregate. The success of a desegregation plan, like the future of a city, is in many respects a self-fulfilling prophecy. It is time for all parties to look past the political expediency of the present to the hope of the future for Dallas and to prophesy idealistically. The Court strongly believes that the citizens of Dallas will join hands in the joint pursuit of our common ideal—the provision of an unsurpassed educational opportunity for all the children of Dallas.

### FINAL ORDER

On March 10, 1976, after hearing evidence and arguments of counsel, the Court entered an Opinion and Order adopting the concepts embodied in the desegregation plan of the Educational Task Force of the Dallas Alliance. In order to carry out these concepts, the School Board of the Dallas Independent School District (DISD) is ORDERED and DIRECTED to implement the following items:

### I. Major Sub-Districts

The DISD shall utilize six sub-districts for student assignment purposes with each having approximately the racial makeup plus or minus 5 percent of the DISD as a whole, with the exception of East Oak Cliff (referred to previously as South Oak Cliff) and Seagoville.

The boundaries for the six areas are as follows:

1. Northwest Sub-District—The boundary is the Dallas-Fort Worth Toll Road commencing at the western boundary of the DISD and extending east to Hampton Road; Hampton Road north to Singleton; Singleton east to Vilbig; Vilbig north to Morris; Morris east to Sylvan; Sylvan north to the Trinity River; the Trinity River north to the Texas & Pacific Railroad; east on the Texas & Pacific Railroad and Pacific Street to Pearl Expressway; south on Pearl Expressway to Commerce Street; east on Commerce Street to the Santa Fe Railroad; south on the Santa Fe Railroad to Central Expressway; northwest on Central Expressway to Live Oak; northeast on Live Oak to Haskell; southeast on Haskell to Swiss; northeast on Swiss to Beacon; northwest on Beacon to Lindell; west on Lindell to Hubert; north on Hubert to Lewis; west on Lewis to Greenville; north on Greenville to Miller; west on Miller to McMillan; north on McMillan to the alley between Morningside and McCommas; west on the alley between Morningside and

McCommas to Central Expressway; north on Central Expressway to Lovers Lane; east on Lovers Lane to Skillman; south on Skillman to the Missouri-Kansas-Texas Railroad; east on the Missouri-Kansas-Texas Railroad to Abrams Road; south on Abrams Road to Mockingbird Lane; northeast on Mockingbird Lane to Whiterock Creek.

2. Northeast Sub-District—The western boundary of the northeast sub-district is the same as the eastern boundary of the northwest sub-district. The southern boundary is the Trinity River from the Dallas-Fort Worth Toll Road southeast on the Trinity River to the Central Expressway (U.S. 75); north on Central Expressway to Harding; northeast on Harding to Brigham; southeast on Brigham to spur railroad; east on spur railroad to Rosine; northwest on Rosine to Pine; northeast on Pine to Electra; northwest on Electra to Rutledge; northeast on Rutledge to Scyene; east on Scyene to Spring; northeast on Spring to Cross; northwest on Cross to Fitzhugh; northeast on Fitzhugh to Seattle; northwest on Seattle to Birmingham; northeast on Birmingham to Texas & Pacific Railroad; southeast on Texas & Pacific Railroad to Foreman; southwest on Foreman (extended) to Scyene; east on Scyene to Buckner; north on Buckner to Military Parkway; east on Military Parkway to eastern boundary of DISD.

3. Southeast Sub-District—The northern boundary of the southeast sub-district is the same as the southern boundary of the northeast sub-district. The western boundary beginning at Central Expressway and the Trinity River; southeast along the Trinity River to the northern boundary of the Seagoville area; eastward along the northern boundary of the Seagoville area to the DISD boundary.

4. East Oak Cliff Sub-District—The eastern boundary of the East Oak Cliff sub-district begins at the District line and the Trinity River and extends northwesterly along the Trinity River to Interstate 35; Interstate 35 south to DISD boundary.

5. Southwest Sub-District—The eastern boundary of the southwest sub-district is the same as the western boundary of the East Oak Cliff sub-district and the northern boundary is the same as the southern boundary of the northwest sub-district.

6. Seagoville Sub-District—The northern boundary of the Seagoville area is Jordan and Alexander Roads extended to the District boundary.

## II. *Student Assignment Criteria Within Sub-Districts*

The following criteria shall be used to incorporate the concepts embodied in the Court's Opinion and Order of March 10, 1976:

1. The DISD is divided into six sub-districts, reflecting generally the Northwest, Northeast, Southeast, East Oak Cliff, Southwest, and Seagoville geographical sections of the District.

2. With the exception of East Oak Cliff and Seagoville, the Anglo combined minority ratio of the DISD is approximated in each sub-district plus or minus five percent.

3. Grade level configurations are standardized throughout the district to include grade K–3 Early Childhood Education Centers, grade 4–6 Intermediate Schools, grade 7–8 Middle Schools, and grade 9–12 High Schools. Certain buildings house K–3 Early Childhood Education Centers and 4–6 Intermediate Schools.

4. Where possible, present student assignments are retained in naturally integrated areas, but grade configurations are standardized.

5. Students are assigned to school buildings appropriate to their age and number and to program needs, with relocatable buildings being used where necessary.

6. Students in kindergarten and grades 1–3 are assigned according to present elementary assignment patterns except that K–3 students in Booker T. Washington have been assigned to Wm. B. Travis, and K–3 students in Stephen F. Austin have been assigned to David Crockett. If there is no school within two miles, students are assigned to the next nearest appropriate school.

7. Generally students in grades 4–8 are assigned to centers in areas of centrality. A less central location is used where the location will meet the ethnic makeup of the sub-district or where facilities requirements prohibit a more central location.

8. Transportation distance and time are minimized to the extent possible.

9. Voluntary enrollment, District-wide, is provided in Vanguard schools for grades 4–6, in Academies for grades 7–8, and in magnet schools for grades 9–12.

10. Attention is focused on Vanguard and Academy programming available in the East Oak Cliff sub-district on the 4–8 level.

11. For students in grades 9–12 who do not desire to attend a comprehensive magnet high school or participate in one of the transfer programs, the traditional high school in their regular attendance zone will constitute their assigned school.

Appendix A, attached hereto, provides student assignments for the 1976–1977 school year, together with figures and percentages.

III. *The K–3 Early Childhood Education Centers*

The DISD shall provide a comprehensive program of instruction in all areas based on the developmental needs of young children and the District's Baseline Curriculum Program. The K–3 approach shall be primarily diagnostic-prescriptive. The approach in the DISD Baseline Curriculum implementation shall include:

1. Individualization of instruction.

2. Principal and staff planning for implementing the DISD Baseline Curriculum Program in each school, in conjunction with parent advisory committees at each school site.

3. Reduction of the adult-pupil ratio from the existing district-wide ratio through tutoring, the use of parents, other adult volunteers, older students and the addition of paraprofessionals. The adult-student ratio of 1–10 shall be the goal to be achieved as rapidly as possible.

4. Continuation of a Staff Development Program consistent with the State Board of Education Plan and conducted to implement the DISD Baseline Curriculum, to meet early childhood education needs and to further the individualization of instruction. This training shall involve parents in participating roles.

5. Effective partnerships with community groups, business and other agencies which serve young children.

6. Efforts to maximize the involvement of parents in planning, reinforcing and complementing their children's learning.

7. Use of the local Early Childhood Education Center as the administrative unit which has primary responsibility for delivering quality learning experiences.

In order to further develop, refine and extend the District's program for early childhood education, the DISD will establish in 1976–1977 at least two exemplary development and demonstration classes for children in the East Oak Cliff sub-district. The DISD shall continue to develop prototypic enrichment programs, such as those at the Paul L. Dunbar and the William B. Travis Centers, for K–3 students.

Booker T. Washington School, scheduled for possible use as a Math-Science Magnet, shall be closed as an elementary K–6 school and its K–3 students reassigned to the Wm. B. Travis School. Stephen F. Austin School, scheduled for possible use as a Medical Professions Magnet, shall be closed as an elementary K–6 school and its K–3 students reassigned to the David Crockett School.

In order to give priority to all schools in East Oak Cliff on the K–3 level, R. L. Thornton and T. L. Marsalis Centers shall not be used in reporting or computing the comparability report which is required by ESEA, Title I, of the United States Department of Health, Education and Welfare, Office of Education, during 1976–77, 1977–78, and 1978–79.

IV. *The 4–8 Intermediate and Middle School Centers*

The DISD shall establish intermediate school centers (4–6) and middle school cen-

ters (7–8). The instructional program in these 4–6 and 7–8 centers shall follow the DISD's Baseline Curriculum. Each principal and his staff shall develop, in conjunction with parent advisory committees in his school, plans for the implementation of this Baseline Curriculum in his school.

The DISD shall establish 4–6 Vanguard schools and 7–8 Academies as needs are identified with first priority in the East Oak Cliff area.

The 4–6 Vanguard schools shall include all students presently enrolled. For those student stations which remain, District-wide racial ratios plus or minus 10% should apply with first priority to the ethnic group(s) who are not presently represented in the school by District-wide ratio. These students may apply from anywhere in the District.

Beginning with 1976–77 the DISD shall establish 4–6 Vanguard schools at Maynard Jackson, Mark Twain, Sidney Lanier, and K. B. Polk.

The 7–8 Academies shall reserve student stations for District-wide attendance as follows: The number of Black, Mexican-American and Anglo students in each Academy shall equal the total student capacity of that school times the ratio of each group of students in the 7–8 student population in the Dallas Independent School District as of December 1, 1975, plus or minus 10 percent. Student stations shall be reserved for all groups.

For an Academy which is an add-on to a present school such as Oliver W. Holmes, the program shall operate as a "school within a school." Students presently enrolled at Holmes shall apply in the same manner as students in other district schools. The "school within a school" shall not as such have a particular attendance zone. All 7–8 Academies shall have a District-wide attendance zone. Beginning with 1976–77 the DISD shall establish 7–8 Academies at Pearl C. Anderson, Sequoyah and Oliver Wendell Holmes.

In order to implement the Court's Order regarding 4–6 Vanguard schools and 7–8 Academies, these centers shall not be used in reporting or computing the comparability report which is required by ESEA, Title I, of the United States Department of Health, Education and Welfare, Office of Education, during 1976–77, 1977–78, 1978–79.

## V. 9–12 Magnets and High Schools

The District shall establish at least four new senior high magnets in 1976 and at least three additional by 1979, as designated by DISD. The DISD shall continue its comprehensive program at existing high school sites, as well as career clusters at Skyline Career Development Center, Pinkston, Adamson, and other Career Development Centers. The new magnet schools may be selected from the following as examples:

1. A Math/Science Magnet at Booker T. Washington

2. A Child-Related Careers Magnet at City Park Elementary

3. A Health Professions Magnet utilizing Baylor Hospital facilities and Stephen F. Austin facilities

4. A Creative Arts Magnet utilizing Fair Park facilities and James Madison facilities

5. A Business and Management Academy utilizing facilities in the Central Business District and Crozier Technical High School facilities

6. A Language-Linguistic and Humanities Magnet in cooperation with the El Centro campus of the Dallas County Community College District

7. A Transportation Technology Institute utilizing former automobile sales and service facilities where available in the downtown area

8. A Comprehensive Aerospace and Transportation Magnet at Love Field.

Final decisions regarding these magnet programs shall be made by DISD after consultation with the Career Advisory Committee or other appropriate committee established by the Dallas Chamber of Commerce. The DISD has the right to make adjustments in the future in programs and building locations, subject to the requirements

regarding new construction in Paragraph XIII.

The 9–12 Magnet High School programs shall be available on a voluntary basis on a full-time or part-time transfer basis for three years beginning 1976–77. Beginning 1979–80 the DISD shall require full-time attendance in comprehensive High Schools associated with any Magnet program. This shall apply to all 9–12 Magnet programs including those at Skyline. Students may transfer freely from district high schools on a term by term basis.

Any student who enters the 9–12 Magnet programs during this three year period may, if he/she desires, continue on a part-time basis until graduation.

Much of the academic work associated with a high school diploma may of necessity be offered at a central location until an adequate number of full-time students have enrolled (estimated 400) to make an academic program cost effective.

The number of Black, Mexican-American and Anglo students in each Magnet Comprehensive High School shall equal the total student capacity of that school times the ratio of each group of students in the 9–12 student population in the Dallas Independent School District as of December 1, 1975, plus or minus ten percent. Student stations shall be reserved for all groups.

The Skyline, Adamson, and Pinkston High Schools shall continue to operate as comprehensive high schools with regular attendance zones.

As a policy these Magnet High Schools of superior quality should be opened as rapidly as they fill, so as to accommodate all students who wish to enter the Magnet High School system. In other words, the seven called for above by 1979–80 are a minimum.

When new campuses and facilities are developed, as provided in Paragraph XIII, provision shall be made for a comprehensive High School program including all extra-curricula activities. In addition Interscholastic League rules shall be provided so as to enable pupils attending Magnet High Schools to participate fully in Interscholastic League activities.

Tenth and eleventh grade students enrolled in any high school during 1975–76 within the Dallas Independent School District may, in 1976–77 and 1977–78, choose to continue to attend that high school until graduation. If students were transported by the district in 1975–76, transportation will be continued for these two years.

Students presently in grades 10–11 and their parents must be informed in writing about their program and school options prior to the end of the 1975–76 school year. This information shall provide as a minimum the following options:

A. That a student may continue in the school he or she is presently attending, or

B. That a student may attend the Magnet school of his or her choice, or

C. That a student may elect to transfer under the Majority to Minority provisions, or

D. That a student may attend school designated as his or her regular attendance zone.

If, after the 1976–77 school year, an area high school is designated as a magnet comprehensive high school, students enrolled in that school may choose to attend any school in the DISD. An exception is that the student may not select a high school which is already integrated such that it upsets the racial balance of that school as hereinabove provided in Paragraph II. The school the student selects becomes his/her assigned high school.

In order to implement this Court's order regarding 9–12 Magnet schools, these centers shall not be used in reporting or computing the comparability report which is required by ESEA, Title I, of the United States Department of Health, Education and Welfare, Office of Education during 1976–77, 1977–78, 1978–79.

## VI. *Special Programs*

### A. *Career Education*

The DISD shall continue to implement its career education plan, Grades 1–12, as rapidly as possible.

**B.** *Bilingual Education*

1.  The present Bilingual Program based on the State Board of Education Plan shall be expanded as rapidly as possible to all pupils in grades K–6. State Senate Bill 121 shall serve as reference-guideline for this program's vertical (grade level) and horizontal (school site) expansion.

2.  English-as-a-Second Language (ESL) programming shall be expanded as rapidly as possible to serve all Spanish-monolingual students, especially in grades 7–8 and 9–12.

**C.** *Multicultural Social Studies Education*

The DISD shall provide multicultural social studies educational programs for students in all grade levels.

**D.** *Plan A Program*

1.  The Plan A Program now being provided by the DISD shall be administered according to the State Board of Education Plan and Guidelines.

2.  Students who require special instructional techniques and arrangements by reason of handicapping conditions shall be served by the DISD's special educational program, consistent with the State Board of Education Plan and Guidelines.

**VII.** *Majority to Minority Transfer*

The DISD shall fully advise all students of this program and encourage participation in it.

1.  Prior to the beginning of each school year the District will determine for that particular school year the estimated racial composition of:
    (a) its total K–3 Early Childhood Education Center scholastic population,
    (b) its total 4–6 Intermediate School Center scholastic population,
    (c) its total Middle School Center scholastic population,
    (d) its total Senior High School scholastic population,

by percentages between Black, Mexican-American, and Anglo scholastics.

2.  The terms "attendance Early Childhood Education Center," "attendance Intermediate School," "attendance Middle School," and "attendance Senior High School," as used herein shall mean the particular school to which the student would normally be assigned by the District in the absence of the operation of a special assignment program, permission, an order or a regulation, including, but not limited to, the majority to minority transfer provisions.

3.  Any student assigned to a particular attendance K–3 Early Childhood Education Center serving kindergarten through third grade in which the percentage of members of his race is greater than the District-wide percentage of members of his race for Early Childhood Education Centers shall be permitted to transfer to any Early Childhood Education Center school in the School District containing his grade level in which the percentage of members of his race is less than the District-wide percentage of his race for Early Childhood Education Centers.

4.  Any student assigned to a particular attendance Intermediate School serving fourth, fifth, and sixth grades in which the percentage of members of his race is greater than the District-wide percentage of members of his race for Intermediate Schools shall be permitted to transfer to any Intermediate School in the District containing his grade level in which the percentage of members of his race is less than the District-wide percentage of members of his race for Intermediate Schools.

5.  Any student assigned to a particular attendance Middle School serving seventh and eighth grades in which the percentage of members of his race is greater than the District-wide percentage of members of his race for Middle Schools shall be permitted to transfer to any Middle School in the District containing his grade level in which the percentage of members of his race is less than the District-wide percentage of members of his race for Middle Schools.

6.  Any student assigned to a particular attendance Senior High School in which the percentage of members of his race is greater than the District-wide percentage of members of his race for Senior High Schools shall be permitted to transfer to

any Senior High School in the District containing his grade level in which the percentage of members of his race is less than the District-wide percentage of members of his race for Senior High Schools.

7. Students requesting Majority to Minority Transfers must do so prior to one week before the beginning of the school year, and must agree to attend that school for the entire academic school year.

8. All transfers provided for in this section shall be permitted on the basis of student-station availability, and Majority to Minority Transfers will be given preference over other transfers.

9. A student's disciplinary record shall not constitute the basis for denying a Majority to Minority Transfer, nor for sending him/her back to a previously assigned school once this transfer has been made. Any discipline problem shall be handled at the school to which a student has transferred.

VIII. *Minority to Majority Transfers*

Mexican-Americans who comprise less than five percent of the school to which they are originally assigned, may transfer to a school that offers the Bilingual Education Program. Transfers provided in this section shall be permitted on the basis of student-station availability.

IX. *Curriculum Transfers*

Students who are physically handicapped, mentally retarded, highly gifted, those who seek career education courses, and other special-course students, shall be permitted to attend those schools offering appropriate facilities and courses; provided that all such transfers shall be on a nondiscriminatory basis. Such transfers shall be permitted on a space available basis with final decisions to be made by the DISD.

X. *Transportation*

1. All students in the Dallas Independent School District who are reassigned to a new attendance zone or who choose to attend a magnet school as their assigned school by virtue of this Court Order, shall be eligible to receive free transportation provided by the Dallas Independent School District.

2. Where at least twenty students from a given community, zone, or point of origin will be traveling to a single destination, for any reason permitted under this Order, the DISD shall provide transportation in the form of a DISD bus.

3. Where the number of students moving to a given designated school is less than twenty, transportation shall be provided in the form of special bus tokens or bus cards distributed directly to the student involved to be used on the regular Dallas Transit System (DTS) routes.

4. When the combined one-way distance between home to DTS-route and DTS-route to school exceeds 2 miles, special arrangements for transportation shall be made by DISD.

5. For those students who are transported under any of the provisions of this Court Order, in the event of emergencies or illness, the school shall either arrange transportation to home or make other appropriate accommodations as deemed necessary by the school.

6. The District shall receive from the Texas Education Agency the maximum total base cost for maintenance, operations, salaries, and depreciation for each seventy-two passenger bus needed to transport students, as required by this Court Order.

XI. *Changes in Attendance Zones*

The DISD may adjust attendance zones and reassign students as it determines to be necessary to conform to building space requirements from year to year so as to most effectively utilize facilities and/or promote further desegregation. For the 1976–1977 school year, adjustments will occur between the following attendance zones:

1. Lenore K. Hall and Leslie A. Stemmons
2. Harrell Budd and Roger Q. Mills
3. David Crockett and William Lipscomb
4. William Lipscomb and Robert E. Lee.

The DISD shall have the responsibility for informing all residents of these areas of these adjustments.

Before the beginning of the 1977–78 school year, the DISD shall review all K–3 attendance zones, and adjust them in order to achieve as much natural integration as possible, with pupils assigned two miles or less from their home. If there is no school within two miles of their home, then assign student to nearest school which would promote integration, if in so doing, the student would have to go no more than four miles from home. Dr. Josiah Hall, the Court's expert, shall be retained to advise the Court on these changes.

Demographic changes which occur subsequent to this total review and readjustment of K–3 attendance zones will not be attributed by the Court to "state action" of the DISD. Private actions which produce changes in housing patterns after 1977–78 shall not be the basis for mandating the DISD to redraw the K–3 attendance zones to reflect any particular racial balance.

## XII. *Discipline and Due Process*

Good order and discipline are essential to good education and to the implementation of this plan. The DISD, in concert with teachers, principals and parents shall develop a clear and simply-stated policy on student discipline, including provision for due process procedures. All parents and students shall be fully advised by the DISD of these rules and regulations governing student conduct in the classroom, in the school, and on the campus. These rules, regulations, and due process procedures shall be applied uniformly and fairly without discrimination.

## XIII. *Facilities*

The DISD shall continue to improve school facilities in accordance with the plan which the Board of Education has developed in consultation with the Task Force for Educational Excellence.

In addition, the DISD shall take immediate steps to construct a new magnet comprehensive Lincoln High School in South Dallas.

The DISD shall make improvements in the facilities at North Dallas.

The DISD shall begin immediate construction of a new K–3 facility and community center in West Dallas for the Juarez-Douglass area. Benito Juarez and Fred Douglass shall remain open to serve grades K–2 and K–3 respectively until the new school is opened.

The DISD shall have as a priority the development of a "central core" of high schools within a two mile distance from the inner highway loop (Central Expressway on the east, East Thornton Expressway on the south, Stemmons Expressway on the west, Woodall Rogers Freeway on the north).

## XIV. *Personnel*

### A. *Recruiting and Employment*

1. The DISD shall develop recruiting and employment policies to insure that competent personnel are employed and that by 1979–1980 the percentages of Black and Mexican-American personnel approximate the percentages, as a minimum, of 31% Black and 8% Mexican-American within each of the following groups:
   a. teachers
   b. principals
   c. other certificated professional personnel (excluding the 142 top salaried administrators mentioned below).

2. For the top salaried administrative positions of coordinator and above (currently established at 142 in number) and for any future reorganization covering these 142 top positions, the following ethnic percentages for these positions are to be achieved by September 1, 1979: 44% Anglo, 44% Black, and 12% Mexican-American. The DISD shall achieve one-third of this transition by September 1, 1977, one-third by September 1, 1978, and the final one-third by September 1, 1979. A variance of 5% in the percentages for this top-salaried group shall be permitted. At all times after September 1, 1979, the Anglo/Black percentages are to remain equal. However, both

will decrease if the percentage of the Mexican-American enrollment in the DISD increases above 12%. (For example, if the Mexican-American enrollment increases to 14%, Anglo and Black would each decrease to 43%.)

3. The DISD may rely on expanded scope of positions, lateral reassignments, promotion and attrition to meet the goals of the above two paragraphs. If there is to be a reduction in the number of principals, teachers, teachers aids, or other staff employed by the DISD which will result in a dismissal or demotion of any such staff member, the staff member to be dismissed or demoted must be selected on the basis of objective and reasonable non-discriminatory standards from among all the staff of the school district. Under no circumstances will staff be terminated or promoted solely on the basis of race.

### B. *Personnel Competence Assessment*

The competence of personnel shall continually be assessed in accordance with policies and procedures established by the DISD.

### C. *Teacher and Principal Assignments*

Assignments for teachers and principals shall be made in accordance with *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211 (5th Cir. 1970). However, if the needs assessment of a given school clearly demonstrates that special circumstances exist and that deviations from the above requirements are necessary in order to best staff and administer the programs in predominately minority schools on such programs as special, vocational and bilingual education, in any school, the DISD shall have the discretion to assign minority teachers to these schools at variance with the respective percentages established by *Singleton.*

### D. *Training*

In depth training of teachers, principals and administrators shall be provided as needed to implement this plan. Attendance shall be required.

### XV. *Accountability System and Auditor*

### A. *Internal Accountability*

The DISD shall file a report with the Court on December 15 and April 15 annually through the school year 1978–79 which includes the following:

1. The number and percentage of pupils by ethnicity attending each educational center, including Vanguard schools, Academies and Magnet high schools

2. The number and percentage of pupils by ethnicity being transported for desegregation purposes to 4–6 and 7–8 centers and to Vanguard schools, Academies and Magnet high schools

3. Majority to Minority transfers:

   a. The number and percentage of pupils by ethnicity and by school participating in this program

   b. The transportation facilities available and convenience of transportation

   c. Efforts made by the DISD to increase participation in this program.

4. The number and percentage of Mexican-American pupils participating in the minority to majority transfer program.

5. The status of the following programs:

   a. The Early Childhood Education Program (K–3)

   b. 4–8 Vanguard and Academy Programs

   c. 9–12 Magnet Programs

   (1) Efforts of the DISD to encourage student enrollment in magnet programs

   (2) Course offerings in each of the magnet programs in operation

   (3) The progress of increasing the number of magnet schools and their location in terms of the timetable set forth in this order.

   d. The Bilingual Program

   e. The Multicultural Social Studies Program

6. The number and percentage of teachers by ethnicity assigned full time in each educational center, including Vanguard schools, Academies and Magnet Schools.

7. The progress toward affirmative action in attaining the recruiting and employment goal, including the number and percentage of new teachers and administrators by ethnicity engaged by the DISD.

8. The current status of capital outlay projects, and the allocation of bond issue funds in relation to the priorities and programs established by this order.

9. The results of the annual standardized achievement tests program by school, grade (grades 2, 4, 6, 8, 9 and 12), and ethnicity.

10. Efforts made by the DISD to successfully implement the Order of this Court, in the following areas:

   a. Parent involvement efforts

   b. Staff development programs

   c. Communications and community relations programs

   d. Student leadership training programs

   e. Safety and security (including due process procedures).

B. *External Educational Audit*

An external educational auditor shall be appointed and instructed by the Court. It shall be a non-political, professional entity, adequately funded, and paid for by the DISD. It shall file a report with the Court annually on June 1 until the 1978–79 school year which includes the following:

1. An audit of each item of the internal accountability report

2. An audit of DISD treatment of a selected sampling of predominantly minority and predominantly Anglo centers (K–3 and 9–12 non-magnet centers) in terms of:

   a. Condition of facilities

   b. Educational offerings: course offerings and teacher allocation

   c. Educational resource allocation in terms of textbooks, libraries, supplies, tutoring efforts and aids, and extracurricular offerings funded by the DISD

   d. Efforts of the DISD to implement school-site planning involving principals, teachers, parents and community in ECE program

   e. Efforts to encourage parent and community participation in the educational process on the 9–12 level

   f. Any other items about which the Court may instruct it.

The results of this external educational audit shall be publicized in the DISD newsletter and the complete audit shall be made available to the public and to all parents or guardians of students in the DISD. Any party to this suit who desires to make comments or be heard regarding the content of the internal accountability reports or the external educational audit may file such comments or motion within thirty days after the filing of the external educational auditor's report on June 1.

XVI. *Tri-Ethnic Committee*

The Tri-Ethnic Committee provided for in the Court's 1971 Order shall continue to receive input from the community regarding the desegregation of the DISD. The Committee shall make reports to this Court at such times as the Committee deems necessary. These reports will advise the Court as to the implementation of this Order, and such other matters as the Court may deem to be proper. A copy of all reports shall be provided to the DISD and the Plaintiffs.

Tri-Ethnic Committee members shall be appointed by the Court for staggered two-year terms beginning July 1, 1976. Lots shall be drawn to determine which members will serve for a one-year term beginning July 1, 1976, and which members will serve for a two-year term beginning July 1, 1976.

XVII. *Retention of Jurisdiction*

To the end that a unitary school shall be achieved in the DISD, the United States District Court for the Northern District of Texas retains jurisdiction of this case.